UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **TINA BOMBE, d/b/a PATIENT CENTERED BEHAVIORAL STAFFING, LLC,**<br><br>Plaintiff,<br><br>**v.**<br><br>**LAPEER COUNTY COMMUNITY MENTAL HEALTH and BROOKE SANKIEWICZ,**<br><br>Defendants. | **2:24-CV-12793-TGB-EAS**<br><br>HON. TERRENCE G. BERG<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 39),**<br><br>**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 46),**<br><br>**AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT (ECF NO. 44)** |

Plaintiff Tina Bombe, d/b/a Patient Centered Behavioral Staffing, LLC ("PCBS"), brings this action against Lapeer County Community Mental Health ("LCCMH") and LCCMH's CEO Brooke Sankiewicz, alleging Plaintiff was wrongfully terminated in violation of the First Amendment, the Contracts Clause, the Michigan Whistleblowers' Protection Act ("WPA"), and public policy. ECF No. 1.

After the close of discovery, Defendants filed a Motion for Summary Judgment (ECF No. 39) that is fully briefed (ECF Nos. 43 & 47). Plaintiff then filed a Motion for Leave to File a First Amended Complaint to clarify that she brought a breach of contract claim (ECF No. 44), which is also

now fully briefed (ECF Nos. 48 & 49). Finally, Plaintiff filed her own Motion for Summary Judgment (ECF No. 46), and that motion is also fully briefed (ECF Nos. 50, 51, & 53). The Court heard oral argument on the pending motions on August 4, 2026.

For the following reasons, the Court will **GRANT** Defendants' Motion for Summary Judgment (ECF No. 39), **DENY** Plaintiff's Motion for Summary Judgment (ECF No. 46), and **DENY** Plaintiff's Motion for Leave to File a First Amended Complaint (ECF No. 44).

**I. BACKGROUND**

Defendant Lapeer County Community Mental Health ("LCCMH") is a governmental agency that provides mental health services to individuals regardless of their ability to pay. Compl., ECF No. 1, ¶ 1. LCCMH receives local, state, and federal funding. *Id.* Defendant Brooke Sankiewicz ("Sankiewicz") is the Chief Executive Officer ("CEO") for Defendant LCCMH. *Id.* at ¶ 4.

Plaintiff Tina Bombe was hired as a psychiatric mental health nurse practitioner ("NP") to help prescribe medications for patients at LCCMH from December 7, 2023, until the day she was terminated on July 24, 2024. *Id.* at ¶¶ 21, 115; Declaration of Brooke Sankiewcz, ECF No. 43-25, PageID.926. She created her own LLC, Patient Centered Behavioral Health Staffing, after her interview with LCCMH. Deposition of Tina Bombe ("Bombe Depo."), ECF No. 39-3, PageID.276. She was under the supervision of Dr. Sarah Steinacker, LCCMH's Medical

Director. Declaration of Dr. Sarah Steinacker ("Steinacker Decl."), ECF No. 39-10, PageID.496–98; *see also* Authorization for Delegation of Prescribing Controlled Substances, ECF No. 43-3, PageID.605.

Plaintiff's contract required providers like herself to schedule psychiatric evaluations for one hour, to schedule "medication reviews" for half an hour, to set aside one hour each for paperwork completion, and to complete and submit documentation of services to consumers' Electronic Health Record ("EHR") within 24 hours (maximum 72 hours) of the service; LCCMH uses Optimal Alliance Software Information System ("OASIS") to store EHRs. Practitioner Agreement ("Agr."), ECF No. 39-2, PageID.260–61. Dr. Steinacker stated these times are standard for community mental health and 30 minutes to review or reconcile medication was "very generous." Deposition of Dr. Sarah Steinacker ("Steinacker Depo."), ECF No. 43-7, PageID.673. Plaintiff's contract also provided that it could be terminated at any time, in writing, for "inadequate performance" or if continuation would jeopardize the "health, safety, and welfare of a consumer." Agr., ECF No. 39-2, PageID.259.

**A. Medication Reviews**

LCCMH's policies define "medication review" or "medication reconciliation" as "the process of identifying the most accurate list of all medication that the patient is taking, including name, dosage, frequency, and route, by comparing the medical record to an external list of

medication obtained from a patient, hospital, or other provider." ECF No. 43-5, PageID.621. LCCMH's procedures further provide that:

> Prior to the prescription of *psychotropic medication*, the prescriber gets a complete history, including the current physical and psychiatric medication regime for the person served.

ECF No. 43-4, PageID.608 (emphasis added).

Usually, when a patient comes to LCCMH, the patient first sees a nurse or medical assistant to check vitals, discuss new lab reports or concerns with medications, and collect information regarding medication if it is not already in that patient's EHR chart, before meeting with the provider. Deposition of Brooke Sankiewicz ("Sankiewicz Depo."), ECF No. 39-4, PageID.307. Dr. Steinacker explained that a provider would then meet with the patient and "reconcile the medication" by verifying what medications the patient is prescribed and asking if the patient takes any over-the-counter medication, any supplements, or herbal tea. Steinacker Depo., ECF No. 43-7, PageID.671. CEO Sankiewicz noted in her deposition that prescribers can use "self-reported history . . . [as] one of the options . . . left to the discretion of the . . . prescriber" to reconcile medications. Declaration of Brooke Sankiewicz ("Sankiewicz Decl."), ECF No. 39-4, PageID.364.

After medication is reconciled, the provider completes their documentation of services to patients within OASIS, which includes a "Medication Reconciliation Button" in the area for the prescriber's notes.

That button, when selected, affirms that the prescriber reviewed "ALL known prescriptions, over-the-counters, herbals, and vitamin/mineral/dietary (nutritional) supplements," including their "name, dosage, frequency and route of administration." Compl., ECF No. 1, PageID.11, ¶ 11.

But while working at LCCMH, Plaintiff often felt that she did not have sufficient information to click the Medication Reconciliation Button in good conscience. She stated she would only click on the button if she could be "100% for certain . . . [that she could] know for sure." Bombe Depo., ECF No. 39-3, PageID.281. As a result, when Plaintiff did not have the information she deemed sufficient to click the Button, she refused to prescribe medications altogether.

For instance, Plaintiff felt there was not enough information added by the medical assistant in patients' EHR for her to meaningfully reconcile medications. *See, e.g.*, April 18th Meeting Minutes, ECF No. 43-10, PageID.730 (Plaintiff reported that "[t]he information reported in the client chart is not always accurate"). Thus, Plaintiff started asking nurses to update patient information in the database prior to patient visits. *See, e.g.*, ECF No. 46-1, PageID.1211 (asking on January 1, 2024 if there was "any way to obtain ER documentation from 12/27/23 reflecting [patient] had a 'slight seizure' . . . prior to her next med review"); *id.* at PageID.1214 (asking on January 22, 2024 "what cardiac condition [the patient] has to help [her] understand the bigger picture");

*id.* at PageID.1224 (asking on March 8, 2024 for advice after noting that the patient was "a poor historian and the supplemental documentation [she] requested was needed for this follow up appt"). Her requests sometimes caused friction within LCCMH, such as when she asked for a urine drug screen prior to seeing a patient without having what her supervisor considered a legitimate reason for ordering the test, given the needs of billing and unnecessary stigma for patients who may not even seek medication for which a urine drug screen would be required. *See* Steinacker Depo., ECF No. 43-7, PageID.661.

Plaintiff also took more time—sometimes weeks more—than what her contract required to gather information and reconcile medications. For example, on December 20, 2023, a patient reported that Plaintiff said she "would like 'a few weeks' to look into her case and talk to previous providers before prescribing any meds" due to multiple medications' failures and the patient's allergies. *See* ECF No. 39-7, PageID.442. But in a community mental health context, where patients are often in crisis and medication may be urgently needed, other LCCMH's employees worried that patients in Plaintiff's care would be put at risk in the meantime, forcing others intervention. *See, e.g.*, *id.* (LCCMH's Triage & Emergency Services Supervisor, Taylor Volpe, telling Sankiewicz that patient was at risk for "re-hospitalization" without a "bridge" medication while Plaintiff looked into medical history); Steinacker Decl., ECF No. 39-10, PageID.497–98 ("One time while I was on vacation this spring, I

received an emergency call that a patient on psychotropic medications had been off her medications for a full week because Tina Bombe would not write her prescriptions. This was very dangerous for the patient and I had to jump in and make sure the patient received her medication."). Dr. Steinacker also lamented that Plaintiff was "not . . . able to complete a psych eval in 60 minutes." ECF No. 43-7, PageID.661.

And Plaintiff did not feel comfortable relying on patient's self-reported history, because she worried they would not tell the truth regarding their medications. *See, e.g.*, ECF No. 39-9, PageID.480 ("[B]ut how do I really know that is what they are taking . . . I will always err on the side of caution if I don't know what they are taking."); *id.* at PageID.469 ("I had a person lie to me once, so I have to have proof. . . . It scares me I don't want to hurt anyone."). For instance, on February 4, 2024, Plaintiff told Dr. Steinacker that she "was not able to prescribe [a patient] medication because [she] had no way to confirm what medications [the patient] [wa]s on and at what doses she was previously being prescribed," because the patient reported taking the highest doses and the information on MAPS did not support what the patient verbalized. ECF No. 46-1, PageID.1219–20; *see also* ECF No. 53-1, PageID.1504 (patient chart showing "no medication changes due to his NP not being able to confirm current B[ehavioral] H[ealth] medication treatment" and scheduling next appointment for the following day). Dr. Steinacker responded that since the patient had recently relocated from

another state, "MAPS won't show what she was Rx'd there." ECF No. 46-1, PageID.1219–20.

Plaintiff then expressed larger concerns to Dr. Steinacker, "[n]ot just for this consumer, but for many I have seen, I am concerned because I have no way to double check what their current medications are, either for BH or medical or previously established diagnosis from another provider." *Id.* Plaintiff explained that she is "conscientious when it comes to making sure [she is] either continuing what [patients] are on, or prescribing BH meds that will not interfere with other medications they are taking." *Id.* at PageID.1222.

Thus, Plaintiff started asking patients for "hard evidence" of their medications, like bringing in their medication bottles. *See* Sankiewicz Decl., ECF No. 39-4, at PageID.364; *e.g.*, ECF No. 46-1, PageID.1225 (Bombe asking nurse on March 13, 2024 if it was "possible to make sure [the patient has] her current medication list and dx list available," or that she "brings in all her medication bottles to update her med list"); ECF No. 39-9, PageID.489 (Bombe telling a patient during a psychiatric evaluation on January 31, 2024 "I won't refill your meds until I see the bottles to confirm that is what meds you are on"); ECF No. 39-9, PageID.481 (on March 27, 2024, Plaintiff told the Recipient Rights Officer that she wanted patients to "bring their medication bottles"). Dr. Steinacker testified that prescribers "could look at the bottles if someone had bottles." ECF No. 43-7, PageID.642. But as a community mental

health clinic, CEO Sankiewicz lamented that "not all of our people could produce bottles." Sankiewicz Decl., ECF No. 39-4, PageID.364. Recipient Rights Officer ("RRO") Lisa Jolly also told Plaintiff on March 27, 2023 that "it is not always feasible" for patients to bring in their bottles, and expressed concerns that Plaintiff's "expectations are not reasonable and how is a recipient able to able to [sic] get their medications as she is a prescriber." ECF No. 39-9, PageID.481.

Bombe testified that she was facing the same issues at her prior place of employment, Creekside Counseling, where she was asked "to see patients that did not have information in the electronic health record as far as . . . medical histories, current medications the patient was taking, et cetera." Bombe Depo., ECF No. 39-3, PageID.269. But she worked there for only two days in September 2023 before her employment was involuntary terminated due to:

> [R]epeated hostile interactions with colleagues, resistance to feedback from management, inefficiency in documentation completion, poor time management causing appointments to run significantly behind schedule impacting client care, and refusal to see clients without adequate continuity of care. The decision was made to terminate Tina following multiple

> complaints from colleagues and clients regarding the creation of a hostile work environment and inadequate care provided.

ECF No. 39-11, PageID.499.

**B. Feedback**

Dr. Steinacker and Sankiewicz similarly felt that Plaintiff was resistant to feedback. As early as February 2024, Dr. Steinacker explained to Plaintiff that there are alternative ways to confirm the information, such as calling the patient's pharmacy, asking the patient's partner, or finding the former prescriber's name from the pill bottle. ECF No. 46-1, PageID.1221. Dr. Steinacker also explained in her deposition that while "[p]rescribing would be at [the NP's] discretion based on [the patient's] symptoms and history," the NP could still prescribe *something* rather than nothing—either at a dose that feels conformable to the NP based on the symptoms, as if starting the patient on a reasonable dose, or prescribing non-controlled medicines to help with symptoms in the meantime—without needing "100%" confirmation of medication history. Steinacker Depo., ECF No. 43-7, PageID.685–86. She noted that knowing the exact dosages of, for example, blood pressure or diabetes medication does not necessarily affect the dosage of behavioral health medication to prescribe. *Id.* at PageID.686–87.

But Dr. Steinacker stated Plaintiff was "not the easiest person to work with," and described her as "very difficult to work with, aggressive, anxious, paranoid"; she was "argumentative[ ] and defensive[ ]"; and

"[v]ery confident, but not flexible when it came with trying to do something a different way," and rather was "very comfortable with the way she's used to doing things." Steinacker Depo., ECF No. 43-7, PageID.661, 675. Sankiewicz also stated that Plaintiff "was very abrasive, argumentative," and would become "upset" when Sankiewicz would share concerns about Plaintiff's delivery of service. Sankiewicz Depo., ECF No. 39-4, PageID.357. Similarly, RRO Lisa Jolly noted that Plaintiff would cry and become "very upset" when she met with her to investigate patient complaints. ECF No. 39-9, PageID.471.

And Plaintiff continued only clicking on the button and prescribing medications if she could "100% for certain . . . know for sure." Bombe Depo., ECF No. 39-3, PageID.281.

**C. Patient Complaints**

Eventually, some patients requested to be reassigned to a different prescriber instead of Plaintiff. This happened at least five times during her seven months at LCCMH. Steinacker Depo., ECF No. 43-7, PageID.661. And in her first three months at LCCMH, between December 20, 2023 and March 28, 2024, seventeen complaints were lodged against Plaintiff. Sankiewicz Decl., ECF No. 43-25, PageID.927. Plaintiff was verbally counseled for 15 of those complaints, three of which resulted in formal complaints.

The first formal complaint lodged on January 31, 2024 (No. 6260) alleged that Plaintiff told a patient during a psychiatric evaluation, "I

won't refill your meds until I see the bottles to confirm that is what meds you are on." ECF No. 39-9, PageID.489. That complaint was substantiated "for failing to provide Services" to the patient. *Id.*

The second formal complaint lodged on March 27, 2024 (No. 6258) alleged that on March 8, 2024, Bombe "refused to refill any of [the patient's] medications" after meeting with the patient for over an hour. ECF No. 39-9, PageID.479. RRO Lisa Jolly told Plaintiff that the patient's chart had all the current medications that she had been on for at least the last five years, and her doctor at Hamilton Clinic warned that the patient was "in crisis and will end up back in the hospital if she doesn't get her med's." *Id.* at PageID.480. Plaintiff responded by stating that she believed the patient was "on way too many psy meds . . . I will always err on the side of caution if I don't know what they are taking." *Id.* That complaint was also substantiated "for failing to provide Services" to the patient. ECF No. 39-9, PageID.482.

The third formal complaint lodged on March 28, 2024 (No. 6257) alleged that Plaintiff told a patient "I feel like you are under the impression you are getting meds today, this is a psy eval." ECF No. 39-9, PageID.469. Tina denied making that statement, but two other employees confirmed the statement to the patient, and the RRO found that the patient was running out of medications and needed refills. The

complaint was substantiated "for failing to provide Services" to the patient. ECF No. 39-9, PageID.476.

On April 2, 2024, the RRO shared updates on the March complaints with Sankiewicz. Sankiewicz stated that "she is consulting with the agency attorney regarding what their options are in regard to [Plaintiff's] contract with the agency." ECF No. 39-9, PageID.481. The remedial action for the March 27 and 28, 2024 complaints was submitted on April 26, 2024, states as follows:

> The agency will be reviewing the responsibilities and role the nurse Practitioner [h]as in the agency as well as reviewing the contractual responsibilities with her. . . .

ECF No. 39-9, PageID.477, 487.

**D. Suspected Fraud**

In addition to Plaintiff's fear of "hurting" clients by prescribing medications when she believed she could not check the "Medication Reconciliation Button" in good conscience, Plaintiff believed it would also be a false claim to Medicare or Medicaid for her (or anyone at LCCMH) to check the Button when she (or others) did not believe she (or they) had enough information to do so.

As support for her suspicion of such false claims, she notes that Sankiewicz acknowledged in her deposition that if nothing was done to address the issue of "non-reconciled" medication on a service documentation, LCCMH "can get cited from the state for not reconciling

medication while prescribing them," and have to enact a "corrective action plan for a timeframe to correct" the issue. ECF No. 39-4, PageID.360; *see also* LCCMH Review of Data Accuracy and Completeness 2021/2022, ECF No. 47-2, PageID.1335–40 ("If below 95% standard [on timeliness of clean claim submission and timeliness of documentation submission] provider must complete a plan of correction . . . ."). But as to whether Medicare or Medicaid funds were paid to LCCMH based on clicking the reconciliation button, Sankiewicz stated that LCCMH does "not receive money on the reconciliation button, so money wouldn't be withheld for not us[ing] that button." *Id.* She also stated that LCCMH does "not receive compensation for the medication reconciliation button," and "there is no billing separately attached as a quality measure." *Id.*

Nonetheless, Sri Gutta, LCCMH's certified medical coder, testified that the Medical Reconciliation Button is required to apply a code for billing purposes, although it does not determine the level of the code. Deposition of Sri Gutta ("Gutta Depo."), ECF No. 53-1, PageID.1484–85 (noting that code 99212 is used when a patient comes in but the provider does not do anything, 99213 when there is nothing new, 99214 when a medication change is needed, and 99215 when there are complications such as a new diagnosis or recent emergency room visit). Gutta explained that when the Medication Reconciliation Button is left blank, coders "look for physician documentation," and "[i]f it is not clear or it is not sent we

reach out to the provider and ask for clarification." ECF No. 53-1, PageID.1485.

Plaintiff believes the suspected payment incentive is why LCCMH pressured her to check the Button. But Dr. Steinacker did tell Plaintiff she was correct not to prescribe medications when the patient's situation did not warrant it. For instance, on January 24, 2024, Steinacker emailed Plaintiff to tell her she had done a good job answering a patient and refusing to prescribe Xanax. ECF No. 46-1, PageID.1217. Thus, Dr. Steinacker stated that "because of some instances where [Plaintiff] didn't [prescribe medications] and maybe there should have been[, m]aybe she thought that she had to every time. . . . [T]hat may have been a misunderstanding." Steinacker Depo., ECF No. 43-7, PageID.680–81.

Plaintiff also believes the suspected payment incentive is why her "Medication Reconciliation Button" was sometimes checked by clerical employees even when she intentionally left it blank. For instance, on a service note from February 4, 2024, Plaintiff wrote "no medication changes due to this NP not being able to confirm current BH medication treatment" and that patient would come back for her "medi[c]ation review" appointment. ECF No. 46-3, PageID.1254. Plaintiff states she did not check the "Medication Reconciliation Button" on that note. Yet, that Button was checked. *See* ECF No. 46-3, PageID.1254. Debbie Ruhlman,

a non-clinical clerical LCCMH employee, testified that she checked the Button herself:

> A I was trained to click the bottom box only.
>
> Q And that's the reconciliation box. Right?
>
> A Correct.
>
> Q So [the psychiatric evaluation] says under CMH medication changes: "No medication changes due to this NP [Tina] . . . not being able to confirm current BH medication treatment." . . . Do you have any explanation as to why the button was clicked yes for reconciliation?
>
> A No, I don't know.
>
> Q Who would have made a change to a document on 2-5-24?
>
> A I would have in March. I was doing this in March.
>
> Q Is it common for you to make changes a month or two later after the appointment?
>
> . . .
>
> A Back then, yes.

Deposition of Debbie Ruhlman ("Ruhlman Depo."), ECF No. 43-11, PageID.763. She stated that Sri Gutta trained her. *Id.* at PageID.739. Gutta in turn acknowledged that the Button should not have been

checked if Plaintiff was "unable to confirm current BH medication treatment." ECF No. 53-1, PageID.1486.

**E. April 18, 2024 Physician's Meeting**

Plaintiff took her concerns to the next supervisory level when she joined the quarterly Physician's Meeting on April 18, 2024. Present were CEO Sankiewicz, Dr. Steinacker, Dr. Sharmalie Sarvananda, COO Laura Moore, QI Supervisor Lisa Ruddy, Administrative Support Services Manager Mandi Brace, Pharmacist Elaina Garvonic, NPs Plaintiff and Porcha Mosley, RRO Lisa Jolly, Registered Nurse Sue Sullivan, and Services Supervisor Stephanie Rudow. ECF No. 43-10, PageID.729–30. The meeting lasted for about an hour and a half. *Id.* Five people had "new business" to discuss, including Plaintiff. *Id.*

Sankiewicz described that Plaintiff was "very loud and agitated" at the April 18 meeting. Sankiewicz Depo., ECF No. 39-4, PageID.357. Dr. Steinacker stated that Plaintiff "kind of hijacked the meeting and focused on the medication reconciliation and we were just talking in circles." Steinacker Depo., ECF No. 43-7, PageID.661 The minutes reported Tina's complaint as follows:

> Requesting medication lists (Tina): Tina feels she has gotten a lot of push back on getting medical history and medication history. The information reported in the client chart is not always accurate.

ECF No. 43-10, PageID.730. Sankiewicz recalls that Plaintiff complained that "not all the information was in the chart." Sankiewicz Depo., ECF

No. 39-4, PageID.359. Dr. Steinacker also recalls that Plaintiff "said that the medications in the chart weren't always accurate, which is true." Steinacker Depo., ECF No. 43-7, PageID.671.

Sankiewicz described that during the meeting, Plaintiff also showed her the "Medication Reconciliation Button" and stated that "what needed to be collected at the time for medication reconciliation in order to check the button was not what she felt was standard in order to click the button." Sankiewicz Depo., ECF No. 39-4, PageID.358. Sankiewicz recalls that Plaintiff brought to the meeting a "paper that outlined what the information button is in OASIS," which stated that "[e]ligible clinician attests to documenting, updating, or reviewing the patient's current medications using all immediate resources available on the date of the encounter." *Id.* The paper explained that:

> Documentation of current medications in the medical record facilitates the process of medication review and reconciliation by the provider. . . . [T]he existing gap in implementation is highlighted in the American Medical Association's Physicians' Role in Medication Reconciliation, which states that 'critical patient information, including medical and medication histories, current medications the patient is receiving and taking, and sources of medications, is essential to the delivery of safe medical care. However, interruptions in the continuity of care and information gaps in patient health records are common and significantly affect patient outcomes.' This is because clinical decisions based on information that is incomplete and/or inaccurate are likely to lead to medication error and ADEs [adverse drug events]. . . . [T]he utilization of health information technology [i]s an opportunity for facilitating the creation of universal medication list. . . . [T]he

> use of EHR can improve the quality of healthcare delivered to patients by reducing medication errors and ADEs.

ECF No. 43-9, PageID.724–26.

Sankiewicz states that Dr. Steinacker offered guidance regarding medication reconciliation during the April 18 meeting, "as somebody that can prescribe and check the button." *Id.* The minutes provide:

> It was stated to use client's self-reported history. If the client is unsure of their current medication, the nurse can reach out to the pharmacy and inquire. Every attempt to gather information should be documented.

ECF No. 43-10, PageID.730. Dr. Steinacker recalls giving Plaintiff "different ways to get the truth, like asking the patient, asking the nurses to check CareConnect360, asking the nurses to call the patient's pharmacy, talking to the primary care doctor, etcetera." Steinacker Depo., ECF No. 43-7, PageID.671.

Dr. Steinacker testified that Plaintiff "claimed that we were making false statements to Medicaid or Medicare which is considered fraud" at the April 18 meeting by clicking the button. Steinacker Depo., ECF No. 43-7, PageID.670. Dr. Steinacker stated during her deposition that the "whole issue with the medication reconciliation was a bit of a headache," before providing the April 18 meeting as an example. *Id.* at PageID.661. Plaintiff also raised her "concern about the button being pushed and she

didn't push it" to Sankiewicz. Sankiewicz Depo., ECF No. 39-4, PageID.359.

Plaintiff states in her deposition that after the Physician's Meeting, Sankiewicz asked Plaintiff if she was going to make an official report or complaint, and Plaintiff responded that is what she had done at the Physician's Meeting. Bombe Depo., ECF No. 39-3, PageID.271.

**F. Continuing Complaints**

Patients and providers continued to complain about Plaintiff's services after the Physician's Meeting, and two additional formal complaints were lodged against Plaintiff.

A fourth formal complaint lodged on June 10, 2024 (No. 5948) alleged that on June 7, 2025, Plaintiff was "rude and wouldn't listen to [a patient]." ECF No. ECF No. 39-9, PageID.446–59. Specifically, Plaintiff noted the patient's blood pressure was high and she was "bulldozing and berating" him about it. *Id.* When Plaintiff started running out of time, she told him, "[Y]ou have 3 minutes to tell me what you want, you have 2 minutes, you have 1 minute." *Id.* It took almost three hours to de-escalate and calm the patient down after the medication review with Plaintiff. *Id.* The patient requested a new prescriber. *Id.* Plaintiff responded to the complaint by explaining that she could not prescribe the medication he wanted because of hypertension. *Id.* The complaint was substantiated on the grounds of "Dignity and Respect." *Id.* at PageID.448.

Corrective action was not taken until July 24, 2024, when Plaintiff's contract was terminated. *Id.* at PageID.459.

On June 13, 2024, Dr. Steinacker emailed Sankiewicz asking for "NP" not to return because "she is causing more harm than good, and even if her patients have to be cancelled until new prescribers start, we might be saving them from a bad experience and preventing further issues." ECF No. 43-16, PageID.795; *see also* Steinacker Decl., ECF No. 39-10, PageID.496 ("[S]everal months before her contract . . . was terminated, I had stated to Brooke Sankiewicz . . . that it would be best to sever relations with Ms. Bombe . . . [I]t would be better if we had nobody in her role than have Tina Bombe go forward in her position."). Sankiewicz responded on June 19, 2024, stating:

> [L]et me know when you are available to meet . . . so we can talk about the NP not returning. I reached out to our labor attorney to review her contract but I have not hear[d] back but I do now have a substantiated rights complaint on her.

*Id.*

The fifth and final formal complaint was lodged against Plaintiff on June 28, 2024 (No. 5995) by Dr. Briscoe from Hamilton Clinic, who expressed concerns to LCCMH that while she had prescribed 10 mg of a medication to a patient on May 30, 2024, Plaintiff reduced that medication to 5 mg on June 18, 2024, before increasing to 10 mg fourteen days later. ECF No. 39-9, PageID.462. The patient had told Plaintiff that she was already taking 10 mg but Plaintiff did not believe her and

reduced the dosage. *Id.* Dr. Briscoe complained that Plaintiff should not have done anything with the level of dosage for the medication. *Id.* The patient had to go back to Hamilton Clinic to increase the dosage and asked for a new prescriber at LCCMH. *Id.* at PageID.463.

On July 5, 2024, RRO Lisa Jolly shared details of the complaint with Sankiewicz, who responded, "action will be taken." *Id.* The RRO was not able to interview Plaintiff before her contract was terminated on July 24, 2024. *Id.* The RRO substantiated the complaint based on a preponderance of the evidence for failing to provide Services to the patient. *Id.* at PageID.464. This marked the fifth substantiated rights complaint against Tina Bombe, # 6260, # 6258, # 5948 and # 6257, in addition to "multiple complaints that were shared with Management and the Medical Director." *Id.* at PageID.463.

**G. Termination**

On July 24, 2024, at 7 p.m., Sankiewicz came into Plaintiff's office and told her she was terminated effective immediately. ECF No. 43-17, PageID.797. Plaintiff stated in her deposition that she "couldn't conceive why I was being terminated because I had never been written up." ECF No. 39-3, PageID.298. She explained that the first time she learned she had a substantiated complaint against her was on July 31, 2024, when she picked up her personnel file.

After being terminated, Plaintiff reported LCCMH to Region 10 for unsafe practices, but "Region 10 reviewed the file and investigation

materials and determined there is no evidence of unsafe practices on the part of Lapeer CMH. . . . The PIHP is closing case 24-46 with a disposition of not substantiated and non-suspicious." March 20, 2026 Compliance Investigation Final Report, ECF No. 51-1, PageID.1456.

Following her termination, Plaintiff also brought the instant lawsuit alleging violations of the First Amendment and the Contracts Clause of the United States Constitution, as well as violations of the Michigan Whistleblowers' Protection Act and Public Policy (Count VI). Compl., ECF No. 1.

**II. LEGAL STANDARD**

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, courts construe evidence in the light most favorable to the non-moving party and draws all reasonable inferences in their favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and admissions on file that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden under Rule 56, its opponent "must do more than simply show that there is some metaphysical doubt as to the material facts" and instead must

come forward with "specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 586-87. If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine dispute of material fact for trial. *Id.* at 587.

## III. DISCUSSION

Defendants moved for summary judgment on all of Plaintiff's federal and state claims. ECF No. 39. Plaintiff responded in opposition. ECF Nos. 42 & 43. Plaintiff then filed a Motion for leave to amend her complaint to add a breach of contract claim (ECF No. 44), which Defendants opposed (ECF No. 48). Plaintiff later filed her own motion for summary judgment (ECF No. 46), which Defendants opposed (ECF No. 50). Generally, "[w]hen reviewing cross-motions for summary judgment, the court must assess each motion on its own merits." *Clair v. Zmo Homes LLC A Foreign Ltd. Liab. Co.*, 2026 U.S. Dist. LEXIS 88790, at *2 (E.D. Mich. Apr. 22, 2026) (Parker, J.). But it would be redundant to do so in this case, given that Plaintiff's motion for summary judgment largely repeats the same arguments she made in her Response to Defendants' motion for summary judgment. The most important difference is that she adds that summary judgment is also warranted in

her favor on her implied breach of contract claim. Accordingly, the Court will discuss the motions claim by claim, starting with the federal claims.

**A. FEDERAL CLAIMS**

**1. Count I & II: First Amendment Retaliation**

The First Amendment of the United States Constitution, as applied to state action through the Fourteenth Amendment, states: "Congress shall make no law . . . abridging freedom of speech." Plaintiff argues Defendant Sankiewicz terminated her in retaliation for her speech at the Physician's Meeting on April 18, 2024—where she raised concerns that LCCMH may be committing fraud when clicking the Medication Reconciliation Button—in violation of the First Amendment. She brings a § 1983 claim against Sankiewicz, and a *Monell* claim against LCCMH, a governmental agency.

Sankiewicz argues she is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). The burden is on the plaintiff to demonstrate that a government official is not entitled to qualified immunity. *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014). During the hearing on August 4, 2026, Sankiewicz did not argue that the First Amendment rights at issue in this case were not clearly established.

Rather, Defendants argued that Sankiewicz did not violate Plaintiff's First Amendment rights in the first place, such that there was no unconstitutional conduct on the part of Sankiewicz or LCCMH. *See Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019) ("[W]here there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability.").

To prevail on a claim of retaliation for activity protected by the First Amendment, a plaintiff must show that: "(1) she engaged in constitutionally protected speech, (2) she suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech, and (3) the protected speech was a substantial or motivating factor for the adverse action." *Kirkland v. City of Maryville, Tennessee*, 54 F.4th 901, 907 (6th Cir. 2022).

"If the plaintiff meets this initial burden, it then falls to the employer to show that it would have reached the same decision to terminate the employee even in the absence of the protected speech." *Williams v. Zurz*, 503 F. App'x 367, 371 (6th Cir. 2012). But "[u]nlike the burden-shifting analysis in Title VII cases, if the defendants meet their burden, the burden does not shift back to plaintiff to show pretext." *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 n.4 (6th Cir. 2010); *see also Holsapple v. Cunningham*, 817 F. App'x 95, 104-06 (6th Cir. 2020) (noting that "the *McDonnell Douglas* burden-shifting framework is inapplicable to a First Amendment retaliation claim"

because "*McDonnell Douglas* concerns race discrimination—not First Amendment retaliation"). Instead, if the employer can show by a "preponderance of the evidence" that it "would have taken the same action in the absence of the protected activity, [the employer] is entitled to prevail on summary judgment." *Maben v. Thelen*, 887 F.3d 252, 262, 267 (6th Cir. 2018).

***(a) Constitutionally Protected Speech***

Courts "engage in a three-step inquiry to determine whether speech by a public employee is protected" under the First Amendment. *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019); *see also MacDonald v. City of Detroit*, No. 19-12183, 2021 WL 323252, at *5 (E.D. Mich. Feb. 1, 2021) (Cleland, J.) (noting that the "same framework should also be applied to first amendment retaliation claims brought by government contractors").

First, courts "ascertain whether the speech addressed a matter of public concern." *Buddenberg*, 939 F.3d at 739 (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)). Second, courts "determine whether the employee spoke as a private citizen or as an employee pursuant to her official duties." *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Third, courts "balance the interests of the parties and determine if the employee's speech interest outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S.

563, 568 (1968)). "A First Amendment claimant must satisfy *each* of these requirements: the *Connick* 'matter of public concern' requirement, the *Pickering* 'balancing' requirement and the *Garcetti* 'pursuant to' requirement." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 338 (6th Cir. 2010).

*i. Matter of Public Concern*

"The First Amendment protects the speech of employees only when it involves "matters of public concern."' *Id.* at 337 (citing *Connick,* 461 U.S. at 143). "[O]nly speech that 'fairly [may be] considered as relating to' issues 'of political, social, or other concern to the community"' is protected, and "public officials enjoy 'wide latitude' in responding to [speech that does not relate to a matter of public concern] without 'intrusive oversight by the judiciary in the name of the First Amendment.'" *Id.* at 338 (citing *Connick,* 461 U.S. at 146). Plaintiff argues that her speech at the Physician's Meeting on April 18, 2024, regarding concerns of fraud at LCCMH raised matters of public concern. ECF No. 46, PageID.1202; *see also Lane v. Franks*, 573 U.S. 228, 241 (2014) (noting that "misuse of state funds—obviously involves a matter of significant public concern"). Defendants take the position that

Plaintiff's speech fails this prong but did not articulate any specific argument in support of this position. ECF No. 39, PageID.248 n.4.

*ii. Private Citizen*

Next, the First Amendment protects speech involving matters of public concern by a public employee who is speaking "as a private citizen," but not by a public employee speaking "as an employee pursuant to her official duties." *Buddenberg*, 939 F.3d at 739 (citing *Garcetti*, 547 U.S. at 421). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. Thus, "the mere fact that a citizen's speech concerns information acquired by virtue of [her] public employment does not transform that speech into employee—rather than citizen—speech." *Id.* Similarly, "speech that an employee's ordinary job responsibilities would not require them to make . . . is less likely to be within an employee's ordinary job responsibilities . . . ." *Ashford v. Univ. of Michigan*, 89 F.4th 960, 972 (6th Cir. 2024). "Conversely, [the Sixth Circuit has] viewed internal escalations of concerns or grievances as insufficient to establish private speech when the speech directly relates to or otherwise concerns an employee's day-to-day duties." *Id.*

Plaintiff argues that she was not required to attend the Physician's Meeting on April 18, 2024, and her presence was voluntary. Indeed, the record shows that Plaintiff was teleworking that day, but drove in for the

meeting. Plaintiff argues that her job was to prescribe medication, not monitor compliance or speak out about the agency's dangerous or fraudulent practices. As such, she argues that while her concerns arise from her duties to conduct medical reconciliation, she was not under a duty to speak up about her concerns.

To the extent Plaintiff spoke about dangerous or incorrect practices she witnessed as part of her job duties—such as feeling pressured to check the Button and prescribe medications even when she felt like she should not—those concerns are directly connected with her official duties as a prescriber working for LCCMH. In fact, she had been complaining about those kinds of inappropriate or potentially dangerous practices to Dr. Steinacker, Recipient Rights Officer Lisa Jolly, and CEO Sankiewicz before the Physician's Meeting took place, such that raising the concerns at the meeting was akin to an "internal escalation[ ] of [her] concerns," which is "insufficient to establish private speech when the speech directly relates to or otherwise concerns an employee's day-to-day duties." *See Ashford*, 89 F.4th at 972.

But there were other matters Plaintiff raised as well. Plaintiff also discussed her concerns about fraudulent practices, notably her experience with LCCMH prescribers checking the Medication Reconciliation Button when, in her opinion, the EHR information is often inaccurate, or when coders were checking a Button that had been intentionally left blank by the prescriber. *See* Steinacker Depo., ECF No.

43-7, PageID.670 (stating that Plaintiff "claimed that we were making false statements to Medicaid or Medicare which is considered fraud" at the April 18 meeting by clicking the button); Sankiewicz Depo., ECF No. 39-4, PageID.359 (stating that Plaintiff also raised her "concern about the button being pushed and she didn't push it"). While Plaintiff's suspicion of fraud arose out of her employment with LCCMH, reporting the fact that *others* were checking the Button does not, in and of itself, fall within *Plaintiff's* assigned day-to-day duties, and her position does not require her to speak up about others' fraudulent activities as part of her official job duties.

Therefore, Plaintiff has presented sufficient evidence for a reasonable juror to find that she was a public employee speaking "as a private citizen" on the limited issue of whether *others* were allegedly fraudulently checking the Medication Reconciliation Button.

*iii. Balancing*

Finally, Plaintiff's interests "as a citizen, in commenting upon matters of public concern" must be balanced against "the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Evans-Marshall*, 624 F.3d at 338 (citing *Pickering*, 391 U.S. at 568). "The State bears [the] burden of justifying the discharge on legitimate grounds." *Rankin v. McPherson,* 483 U.S. 378, 388 (1987) (citing *Connick,* 461 U.S. at 150). "[P]ertinent considerations" include "the manner, time, and place of the employee's

expression," as well as "the context in which the dispute arose," *id.*; "whether the statement impairs discipline by superiors or harmony among co-workers, [or] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary," *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); whether the speech "meaningfully interfere[s] with the performance of [the speaker's] duties, undermine[s] a legitimate goal or mission of the employer," *Williams v. Com. of Ky.,* 24 F.3d 1526, 1536 (6th Cir. 1994); "impede[s] the [speaker]'s proper performance of his daily duties . . . or . . . interfere[s] with the regular operation of the [employer]," *Pickering,* 391 U.S. at 572–73.

It is clear that Plaintiff's *conduct* in refusing to check the Medication Reconciliation Button herself could be said to undermine LCCMH's legitimate goal and mission to "serve[ ] those who are desperate," and "in need of counseling and medication in the community," who "often have nowhere else to turn except to community mental health programs" like its own. ECF No. 39, PageID.248. But this claim pertains to free speech, and Defendants fail to explain how Plaintiff's *speech* at the April 18 Physician's Meeting, concerning other LCCMH's employees allegedly checking the Medication Reconciliation Button fraudulently, "interfere[d] with the regular operation of" LCCMH. *See id.* Although Defendants may have felt that Plaintiff's complaints about the Medication Reconciliation Button were a "headache," and that she "hijacked" the meeting by talking about this issue in circles as Dr.

Steinacker said, the Physician's Meeting was supposed to be a place and time for "open discussion" and Plaintiff's speech itself did not affect either her duties or LCCMH's operations. Therefore, Plaintiff's interest "as a citizen, in commenting upon matters of public concern" is not outweighed by the interest of LCCMH in "promoting the efficiency of the public services it performs through its employees." *See Evans-Marshall*, 624 F.3d at 338 (citing *Pickering*, 391 U.S. at 568).

Balancing all these factors, on this record, a reasonable juror could conclude that Plaintiff's speech at the Physician's Meeting expressing concerns that LCCMH's employees were fraudulently checking the Medication Reconciliation Button is constitutionally protected.

***(b) Adverse Action***

Plaintiff argues there is no dispute she suffered an adverse action when Sankiewicz terminated her employment. *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) ("The term 'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to [h]ire, nonrenewal of contracts, and failure to promote."). She also argues that Sankiewicz's decision to substantiate the alleged recipient rights complaints against Plaintiff may also constitute an adverse action because they affect her future employment prospects in that she must disclose them to prospective employers. Defendants do not appear to contest the fact that Plaintiff suffered adverse action. Instead,

they contend that this adverse action was not caused by Plaintiff's speech, as further discussed below.

#### *(c) Motivating Factor*

In addition to showing that Plaintiff engaged in constitutionally protected speech and suffered an adverse action, Plaintiff must also show that her speech "was a substantial or motivating factor for the adverse action," *Kirkland*, 54 F.4th at 907, or that her termination "was motivated at least in part by [her] protected conduct," *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018). At the motion-for-summary-judgment stage, "the employee must present sufficient evidence linking his speech to the employer's adverse decision so that a reasonable factfinder could conclude, by a preponderance of the evidence, that the speech, at least in part, motivated the decision to discharge." *Taylor v. Keith*, 338 F.3d 639, 646 (6th Cir. 2003). "[T]he question of causation . . . may be satisfied by circumstantial evidence." *Maben*, 887 F.3d at 267.

Plaintiff argues circumstantial evidence of causation lies in Defendants' termination of her contract for "refusing to prescribe medications" and "press the button certifying that 'all known' medications were listed," Def. Br., ECF No. 39, PageID.242–43, because that is precisely the conduct that she reported in her complaints and during the physician's meeting. But as stated above, her *conduct* is not what is constitutionally protected, her *communication and expression of concerns* that LCCMH's employees fraudulently checked the Button is

what is protected. Thus, she must present sufficient evidence linking her speech at the Physician's meeting to her termination so that a reasonable factfinder could conclude that the speech is what motivated the decision to discharge.

Plaintiff argues that the temporal proximity between her complaint at the Physician's Meeting and her termination is circumstantial evidence that the termination was motivated by her speech. But the Physician's Meeting took place on April 18, 2024, and she was fired on July 24, 2024, more than three months later. Even considering Dr. Steinacker's request to terminate Plaintiff as early as June 13, 2024, the fact that Plaintiff had only been with LCCMH since December 2023, the two- or three-month gap between the speech and the adverse action (or the recommendation for adverse action) is less than convincing evidence of causation. Indeed, there is evidence that Sankiewicz considered terminating Plaintiff's contract as early as April 2, 2024, before the Physician's Meeting even took place. *See* ECF No. 39-9, PageID.481 (RRO Lisa Jolly reporting Sankiewicz told her that "she is consulting with the agency attorney regarding what their options are in regards to [Plaintiff's] contract with the agency").

Plaintiff argues that because she had never been disciplined prior to her speech, and was only disciplined after her speech, that this too provides circumstantial evidence that her termination was motivated by her speech. In *Thompson v. Aramark School Support Services, Inc.*, a food

service worker was fired after she had reported food safety violations made by her employer, Aramark. *See* 490 F.3d 506, 508. (6th Cir. 2007). She had not been disciplined during her time at Aramark until after she first raised her concerns about food safety during a board meeting. *Id.* at 509–10. The Sixth Circuit upheld a jury verdict for Thompson, finding that the record "contain[ed] substantial evidence that there was more than a temporal connection between Thompson's conduct and her dismissal" because Thompson "had never been disciplined and had performed her job" prior to her comments at the board meeting. *Id.* Further, Thompson's supervisor acknowledged that she was disciplined for the first time after the board meeting precisely "for her comments." *Id.*

But the evidence in this record does not support Plaintiff's argument on this point. By April 2, 2024, before the Physician's Meeting, three formal complaints had been filed against Plaintiff regarding her provision of services to patients. Even assuming Plaintiff was not aware that formal complaints had been filed, RRO Lisa Jolly discussed concerns with her on March 27 or 28, 2024 about conduct alleged in the complaints. This provides further evidence that Plaintiff, unlike Kim Thompson, "had [not] performed her job" to the satisfaction of Dr. Steinacker and Sankiewicz before the meeting ever took place. *See id.* at 509; *see also West v. Gen. Motors Corp.*, 469 Mich. 177, 187, 665 N.W.2d 468, 473 (2003) ([T]he evidence does not show that plaintiff's record was

'impeccable' or 'unblemished' before the . . . incident or that the discipline imposed was seemingly undeserved . . . .").

Plaintiff also argues there is evidence that management was displeased with her speech during and after the Physician's Meeting, and that this also supports her theory of causation. *See, e.g.*, *Turner v. Parker-Hannifin Corp.*, No. 11-300, 2012 WL 1229125, at *7 (W.D. Mich. Apr. 12, 2012) ("[C]ausation is supported not only by temporal proximity, but also by Defendant's unhappiness with Plaintiff's perceived over-use of FMLA leave, as reflected in the emails."); *Kalia v. Robert Bosch Corp.*, No. 07-11013, 2008 WL 2858305, at *5 (E.D. Mich. July 22, 2008) (finding causation was supported under ELCRA where supervisor was frustrated plaintiff-employee had secured a lawyer and commented that she "should have better things to spend her money on than an attorney"); *Connally v. United States Dep't of Veterans Affs.*, No. 22-10236, 2024 WL 1335183, at *16 (E.D. Mich. Mar. 28, 2024) (finding retaliatory intent for EPSLA where supervisor's "deposition testimony can be read to suggest some level of resentment or ill will toward [plaintiff-employee] for missing work due to COVID when '[w]e [the VA] needed everybody there'").

None of the cases Plaintiff cites relate to First Amendment retaliation claims, but they still suggest a type of circumstantial evidence—evidence of displeasure regarding the protected speech—from which "a reasonable factfinder could conclude . . . that the speech, at least in part, motivated the decision to discharge." *Taylor*, 338 F.3d at 646.

Here, Dr. Steinacker testified that Plaintiff's complaint at the April 18 meeting was a "headache," Plaintiff "hijacked" the meeting with her complaints, and Plaintiff was "paranoid." Steinacker Depo., ECF No. 43-7, PageID.661, 676. There is little question that those are loaded terms expressing displeasure with the speech itself and its content. Sankiewicz did not use such descriptors regarding Plaintiff's complaints, but she noted that Plaintiff was "very loud and agitated" during the meeting, and that Plaintiff's "tone was always harsh." Sankiewicz Depo., ECF No. 39-4, PageID.357.

This evidence may not be particularly persuasive given that Plaintiff did not have an "unblemished employment record" and more than three months had passed between the meeting and her termination. *See West v. Gen. Motors Co.*, 469 Mich. 177, 187 (2003) (citing *Henry v. Detroit*, 234 Mich. App. 405 (1997)) (noting that causation can be established by relying on temporal proximity, supervisors' clear displeasure with his protected activity, and unblemished employment record before the protected activity). Nonetheless, Plaintiff offers evidence that a juror could consider in finding that her speech "at least in part" motivated the decision to terminate her.

***(d) Same Decision***

"Once the plaintiff has met [her] burden of establishing that [her] protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." *Maben*, 887 F.3d at 267. "If . . . the

employer . . . show[s] that it would have reached the same decision to terminate the employee even in the absence of the protected speech," *Williams*, 503 F. App'x at 371, then "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman,* 636 F.3d at 208 ("Unlike the burden-shifting analysis in Title VII cases, if the defendants meet their burden, the burden does not shift back to plaintiff to show pretext."); *see also Maben*, 887 F.3d at 267 ("If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment."). A defendant must make this showing by a preponderance of the evidence. *Maben*, 887 F.3d at 262. Thus, here, summary judgment in favor of Defendants is warranted "only if [their] evidentiary proffer compel[s]"—by a preponderance of the evidence—"the finding that [Plaintiff's speech] did not constitute a 'but for' cause for the [termination]." *See Garvey v. Montgomery*, 128 F. App'x 453, 460 (6th Cir. 2005).

Defendants have presented evidence showing that Plaintiff's speech or complaints regarding alleged fraud was not a "but for" cause of her termination, and that Plaintiff would have been terminated "irrespective" of her complaints. *See id.* Indeed, on the issue of "but for" causation, the record contains uncontroverted evidence that Plaintiff was not fired for her complaints before or during the Physician's

Meeting on April 18, but rather because Sankiewicz "determine[d] or ha[d] reason to believe that the health, safety, and welfare of a consumer [wa]s jeopardized by continuation of" Plaintiff's work agreement, *see* Agr., ECF No. 39-2, PageID.259, such that LCCMH "would have reached the same decision to terminate [Plaintiff] even in the absence of the protected speech." *See Maben*, 887 F.3d at 267.

To begin, on April 2, 2024, weeks before the April 18 meeting, Sankiewicz told the Recipient Rights Officer—after discussing two complaints lodged against Plaintiff from March—that Sankiewicz was "consulting with the agency attorney regarding what their options are in regards to [Plaintiff's] contract with the agency." ECF No. 39-9, PageID.481. Defendants thus had reasons to take action against Plaintiff "irrespective" of Plaintiff's complaints. *See Garvey*, 128 F. App'x at 460.

Next, Defendants presented evidence of multiple complaints by patients against Plaintiff, three filed before the meeting and two filed after the meeting, which were substantiated for Plaintiff's failing to provide services to patients or for not treating patients with dignity during her seven months with LCCMH. *See* ECF No. 39-9. While Plaintiff suggests that the substantiation of the complaints was fabricated after her termination, the substantiation process appears to take time, as evidenced by the July 5, 2024 complaint not being able to be resolved before Plaintiff was terminated on July 24, 2024. But there is evidence that at least one complaint had been substantiated by June 19, 2024,

ECF No. 43-16, PageID.795, and that Sankiewicz was ready to act regarding the March complaints as early as April 2, 2024, before the meeting, ECF No. 39-9, PageID.481.

In addition, the complaints expressed the concern that Plaintiff presented a danger to patients by refusing to prescribe medications, which is a contractual basis for termination, in addition to "inadequate performance," no matter what Plaintiff's reasoning was for the refusal. *See* ECF No. 39-2, PageID.259. To be sure, Plaintiff's decision not to prescribe was discretionary, but to the extent it was done in a manner that endangered patients, it was a terminable offense. And the evidence shows that Plaintiff often took too long to reconcile medications when patients needed urgent treatment, or unnecessarily reduced doctor-prescribed dosages, putting patients at risk.

Even without considering the complaints, Dr. Steinacker, Plaintiff's supervisor, asked on June 13, 2024 for Plaintiff not to return because "she is causing more harm than good, and even if her patients have to be cancelled until new prescribers start, we might be saving them from a bad experience and preventing further issues." ECF No. 43-16, PageID.795. Dr. Steinacker stated "it would be better if we had nobody in her role than have Tina Bombe go forward in her position." Steinacker Decl., ECF No. 39-10, PageID.496. In fact, Steinacker and others had to jump in to prescribe medications to patients when Plaintiff refused to do

so. *See Maben*, 887 F.3d at 262 ("[O]fficers can point to 'disruptive' behavior as a reason for taking action.").

Plaintiff does not argue that the evidence presented by Defendants fails to rise to a preponderance that LCCMH would have terminated her, irrespective of her speech. Rather, Plaintiff argues the alleged "health" reasons for her termination are "mere pretext" because her conduct (refusing to prescribe) was "inextricably linked" to her speech. But "the burden does not shift back to plaintiff to show pretext" in First Amendment retaliation cases. *Eckerman,* 636 F.3d at 208. In any event, as discussed above, Plaintiff's speech was not so "inextricably linked" to her conduct because the fact that *others* checked the Reconciliation Button did not, in and of itself, affect *her* decision to prescribe or not.

And the Court finds that while her speech provided *context* regarding her refusal to check the Button, it does not change the fact that she was not meeting LCCMH's expectations in the first place, that she received numerous complaints regarding failure to provide services to patients, and that Dr. Steinacker and RRO Lisa Jolly told her before and after the meeting that according to them, her conduct was endangering patients.

On this record, Defendants have demonstrated that there is no genuine issue of material fact that a preponderance of the evidence shows that Plaintiff would have been terminated irrespective of her complaints at the Physician's Meeting, and that no reasonable juror could find for

Plaintiff on this issue. *See Garvey*, 128 F. App'x at 460. Therefore, Sankiewicz is entitled to prevail on summary judgment. *See Maben*, 887 F.3d at 267.

Because the *Monell* claim against LCCMH cannot survive without an underlying constitutional violation by Sankiewicz, summary judgment in favor of LCCMH is also warranted. *See Baker*, 936 F.3d at 535 ("[W]here there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability.").

Accordingly, Defendants' motion for summary judgment on the First Amendment claims is granted, and Plaintiff's motion for summary judgment on the First Amendment claims is denied. Counts I and II will therefore be **DISMISSED WITH PREJUDICE**.

**2. Count IV & V: Contracts Clause**

Plaintiff brings two additional § 1983 counts against Defendants for violation of the United States Constitution's "Contract Clause," which provides that: "[n]o State shall . . . pass any . . . law impairing the obligation of contracts." U.S. Const. article I, § 10, cl. 1. As part of these counts, Plaintiff alleged:

> 167. Defendants violated the Contract Clause of the United States Constitution when they took actions impairing their

> contractual obligation to provide written notice of good cause to end its Agreement with Plaintiff Bombe.
>
> 176. Defendant Sankiewicz abused her authority by terminating the Agreement with Plaintiff Bombe without providing written notice of good cause for her decision.

ECF No. 1, PageID.23–25. The working agreement was attached to the original complaint. See ECF No. 1-1, PageID.31–39.

Defendants argue in their motion for summary judgment that a violation of the Contracts Clause is not cognizable through a § 1983 vehicle. ECF No. 39 (citing *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017) ("[A]n alleged Contracts Clause violation cannot give rise to a cause of action under § 1983.").

Plaintiff does not address this legal argument (or the Contracts Clause) in her Response or her Motion for Summary Judgment. Instead, Plaintiff argues that her original complaint pleads sufficient factual allegations to impliedly establish a *breach of contract* claim under the common law, ECF No. 44, PageID.1092, and moved to either amend her complaint to add a seventh count for breach of contract to "clarify that she has been alleging a breach of contract claim" without any additional factual allegations such that there would be "no risk of surprise or prejudice," *see* ECF No. 44-1, PageID.1132, or for summary judgment on her implied state law breach of contract claim. ECF No. 46, PageID.1208. And during the hearing on August 4, 2026, Plaintiff's counsel admitted

that the Contracts Clause counts were mistakenly added instead of a breach of contract count.

Thus, because Plaintiff has abandoned her claims under the Contracts Clause, Defendants' motion for summary judgment on those claims will be **GRANTED** and Count IV and V will be **DISMISSED WITH PREJUDICE**.

**B. STATE LAW CLAIMS**

In addition to the now-dismissed federal claims, Plaintiff brought claims under the Michigan Whistleblowers' Protection Act (Count III), Public Policy (Count VI), and breach of contract (impliedly or as Proposed Count VII), all arising under state or common law. But in the original complaint, Plaintiff alleged that:

> 9. For the federal causes of action, jurisdiction is appropriate in this court in accordance with 28 U.S.C. § 1331.
>
> 10. For the state causes of action, supplemental jurisdiction is appropriate under 28 U.S.C. § 1367. ECF No. 1, PageID.4.

ECF No. 1. The Court confirmed during the hearing on August 4, 2026 that there is no basis for diversity jurisdiction.

Under 28 U.S.C. § 1367(c), the Court "'may' (rather than must) decline to exercise [supplemental] jurisdiction" over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996), *amended on denial of reh'g*, No. 95-5120, 1998 WL

117980 (6th Cir. Jan. 15, 1998). The "decision depends on 'judicial economy, convenience, fairness, and comity.'" *Id.* The Sixth Circuit has noted that, "as a rule of thumb, . . . [w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims . . . ." *Id.* at 1254–55; *see also Artis v. District of Columbia*, 583 U.S. 71, 74 (2018) ("When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims.").

The period of limitations for the claims asserted under supplemental jurisdiction was tolled while the claims were pending in federal court. 28 U.S.C. § 1367(d); *see also Artis*, 583 U.S. at 75 ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, *i.e.,* to stop the clock."). Federal law provides that such claims may be re-filed in state court within the remaining period of limitation "and for a period of 30 days after [they are] dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); *see also Artis*, 583 U.S. at 91 ("Whenever § 1367(d) applies, the defendant will have notice of the plaintiff's claims within the state-prescribed limitations period.").

Thus, without any federal claims remaining, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Without expressing any opinion as to the merits of the implied or proposed breach of contract claim, the motion to amend will be **DENIED**,

and the remaining state law claims— Count III (WPA), Count VI (Public Policy), and any implied or proposed state law breach of contract claim— will be **DISMISSED WITHOUT PREJUDICE**, for lack of subject-matter jurisdiction.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 39) is **GRANTED**. Plaintiff's Motion for Summary Judgment (ECF No. 46) is **DENIED**. Plaintiff's Motion for Leave to File an Amended Complaint (ECF No. 44) is **DENIED**.

It is **HEREBY ORDERED** that Count I and II (First Amendment Retaliation) are **DIMISSED WITH PREJUDICE**. Count IV and V (Contracts Clause) are also **DISMISSED WITH PREJUDICE**. Count III (WPA), Count VI (Public Policy), and any implied or proposed state law breach of contract claim are hereby **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**.

Dated: September 22, 2026

/s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT COURT